## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| C.F.C.,[1] individually and on behalf of those similarly situated; S.C.C., individually and on behalf of those similarly situated; WECOUNT!, INC., a Florida not for profit corporation; FLORIDA IMMIGRANT COALITION, INC., a Florida not for profit corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> MIAMI-DADE COUNTY, FLORIDA; and the MIAMI-DADE CORRECTIONS AND REHABILITATION DEPARTMENT, <br><br> Defendants. | Civil Action No.  1:18cv22956 <br><br> Class Complaint <br><br> **JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND MONEY DAMAGES

Plaintiffs C.F.C. and S.C.C., individually and as representatives of a class of similarly situated persons, WeCount!, Inc. ("WeCount!") and Florida Immigrant Coalition, Inc. ("FLIC"), on behalf of their members and their organizations as a whole, through undersigned counsel, sue Defendants Miami-Dade County, Florida, and the Miami-Dade Corrections and Rehabilitation Department, and state the following:

### INTRODUCTION

1.      This case challenges the legality of Miami-Dade County's policy and practice of arresting people based on a detainer request issued by U.S. Immigration Customs and Enforcement ("ICE"). Under this policy and practice, Defendants jail people for 48 hours or more, even though

---

[1] Plaintiffs have filed a Motion for Leave to Proceed Using Their Initials contemporaneously with this Class Action Complaint.

all criminal charges against these persons have been dismissed, or they have been acquitted, ordered released, or have served their sentences. This policy and practice violates the Fourth and Fourteenth Amendments of the U.S. Constitution as well as Florida law.

2. Defendants began unlawfully arresting people for ICE in response to President Donald Trump's January 25, 2017 Executive Order 13768. The Mayor of Miami-Dade County interpreted the Executive Order as threatening to withhold federal funds from states, counties, and cities that failed to comply with the Administration's immigration agenda. Notwithstanding explicit county policy prohibiting county officials from honoring ICE detainers, the Mayor of Miami-Dade County instructed the Miami-Dade Department of Corrections to comply with all ICE detainer requests in a memorandum issued on January 26, 2017.

3. On February 17, 2017, the Miami-Dade County Commission held a special meeting to address the issue and adopted a resolution ratifying the directive. Concerned community members packed the chambers and raised concerns about the legality of the policy as well as the devastating harm it would cause to immigrant families.

4. A series of court decisions and statements from the Trump Administration clarified that the January 25, 2017 Executive Order would not result in the wholesale withholding of federal funds to localities that declined to arrest people on ICE detainer requests.

5. In spite of the fact that the County's federal funding was not at risk, Defendants have continued to arrest people at the request of ICE.

6. Miami-Dade County and the Miami-Dade Department of Corrections do not have independent authority to arrest individuals without a judicial warrant or probable cause that an individual has committed a crime. Because ICE detainer requests are neither judicial warrants nor

WEIL:\96652573\6\99995.5951

supported by probable cause that an individual has committed a crime, honoring ICE detainer requests violates an individual's Fourth and Fourteenth Amendment rights, as well as Florida law.

7.     These ICE-requested detentions are new arrests. When a state or local law enforcement officer arrests an individual, he or she must have (1) the authority to do so under state and federal law, and (2) the arrest must comport with the Fourth and Fourteenth Amendments to the United States Constitution.  To comply with the Fourth and Fourteenth Amendments, a seizure must be pursuant to a warrant based on probable cause, issued by a neutral magistrate or, otherwise, must fall under an exception to the warrant requirement.  ICE detainer requests are not warrants supported by probable cause, are not issued by neutral magistrates, and do not fall under any exception.

8.     The Defendants' actions have resulted in harm to the Plaintiffs and to the communities that Defendants are supposed to protect.  Miami-Dade County's compliance with ICE detainers—rather than preserving its due allocation of federal dollars—has actually cost Miami-Dade millions of dollars in uncompensated costs for detaining people past the time they otherwise would have been released. Compliance with ICE detainers has also endangered public safety by eroding the trust between the community and law enforcement.

9.     Individuals arrested on allegations of a wide range of charges, even while presumed innocent, are subject to Defendants' policy and practice. Among the charges are various offenses related to driving without a license or driving with a suspended license. Undocumented immigrants in Florida are unable to obtain or renew previously issued driver's licenses, yet poor transportation infrastructure in South Florida virtually requires one to drive in order to carry out basic life sustaining tasks.

WEIL:\96652573\6\99995.5951

10.     As a result of Defendants' actions, parents have been, and continue to be, ripped apart from their children, and immigrant residents of Miami-Dade County, including those with DACA and Temporary Protected Status, live in fear of interactions with local law enforcement.

11.     Plaintiffs seek to stop the Defendants' unlawful, unnecessary, and harmful actions, and seek pecuniary damages.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1367, and 2201–02.  The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq. The Court has equitable power to enjoin enforcement of state or local law that conflicts with federal law.  *See Ex Parte Young*, 209 U.S. 123, 155–56 (1908).

13.     Venue is proper in the Southern District of Florida, because Plaintiffs reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred or will occur in this District and this division of the District. 28 U.S.C. § 1391(b)(2).

## PARTIES

14.     Plaintiff S.C.C. has been a resident of unincorporated Miami-Dade County, Florida for over a decade. S.C.C. was arrested on June 6, 2018 and on July 20, 2018, $2 bail was paid on behalf of S.C.C. Rather than release S.C.C., Defendants unlawfully re-arrested him pursuant to the ICE detainer.  He remains in MDCR custody as of the filing of this action.

15.     Plaintiff C.F.C. is a resident of Miami-Dade County. She is a member of WeCount! and a local business owner. C.F.C. was arrested on May 12, 2018 and posted bond that same day. Instead of releasing her, Defendants unlawfully re-arrested her pursuant to an ICE detainer. After this unlawful re-arrest by Defendants, C.F.C. was detained by ICE. As a result, C.F.C. missed the birth of her grandchild and remains in immigration detention.

4

16.     Plaintiff WeCount! is a community-based, non-profit organization with a membership comprised of Florida residents. The mission of WeCount! is to build the power of the immigrant community of Homestead through education, support, and collective action.

17.     Plaintiff Florida Immigrant Coalition (FLIC) is a non-profit statewide coalition of more than 65 member organizations and over 100 allies. Their mission is to grow the connection, capacity, and consciousness of immigrant families, organizations and communities.

18.     Defendant Miami-Dade County is a political subdivision of the State of Florida that can be sued in its own name. Miami-Dade County is responsible for the acts of Miami-Dade Corrections and Rehabilitation Department ("MDCR"), an administrative department of Miami-Dade County. Defendants Miami-Dade County and MDCR are sued in their official capacities and are "persons" liable for monetary damages pursuant to 42 U.S.C. § 1983. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978).

## FACTUAL ALLEGATIONS

A.      **Federal and State Immigration Authority Under the INA**

19.     The power to regulate immigration lies exclusively with the federal government. Federal immigration policy is codified in the Immigration and Nationality Act ("INA").

20.     The INA strictly limits when a state or local official can arrest and detain individuals for civil immigration purposes. Section 287(g) of the INA allows local law enforcement officers to perform immigration enforcement functions pursuant to a written agreement and only after the officers meet stringent criteria including, but not limited to, adequate training on federal immigration enforcement. *See* 8 U.S.C. § 1357(g)(2)–(6). To the extent a local law enforcement officer cooperates with federal authorities, it must do so under the direct supervision of the Department of Homeland Security ("DHS"). *See* 8 U.S.C. § 1357(g)(3).

WEIL:\96652573\6\99995.5951

21.     The INA does not require local jurisdictions to ask about an arrestee's immigration status, enforce federal immigration law, or otherwise require local law enforcement agencies ("LLEA") to enter into joint agreements under 8 US.C. § 1357(g).  Nor does the INA require LLEAs to collect, maintain, or report information regarding the immigration status of individuals or arrestees.

**B.     Use of Immigration Detainers in Policy and Practice**

22.     When an LLEA arrests a person and books him or her in a local jail, his or her fingerprints and booking information are matched with ICE's and other databases in real time. ICE detainers are issued in reliance on these database matches.

23.     These databases are unreliable and can lead to false positives.  A recent National Public Radio study showed that, from 2007 to 2015, 693 American citizens were improperly held in local jails on federal detainers.  *See* Eyder Peralta, *You Say You're an American, but What if You Had to Prove It or Be Deported?*, NPR.org, *available at* https://www.npr.org/sections/thetwo-way/2016/12/22/504031635/you-say-you-re-an-american-but-what-if-you-had-to-prove-it-or-be-deported#foot1.

24.     Defendants' own records of individuals in their custody on ICE detainers list several individuals as citizens of the United States.

25.     An immigration "detainer" is merely a ***request*** that the DHS issues to an LLEA to re-arrest an individual in the LLEA's custody after that individual is otherwise entitled to release.

26.     Defendants are not required to comply with ICE detainers.

27.     The form used by immigration authorities to lodge an ICE detainer is called a "Department of Homeland Security (DHS) Request for Voluntary Transfer."  *See* Form I-247A; *see also ICE Policy Number 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers* (March   24,   2017),   *available   at*   https://www.ice.gov/–sites/–default/–

files/documents/Document/2017/10074-2.pdf (hereinafter "ICE Policy 10074.2"). The form allows the ICE agent to request that the LLEA hold the individual for a period up to 48 hours—excluding Saturdays, Sundays, and holidays—"beyond the time when the subject would have otherwise been released from [LLEA] custody." 8 C.F.R. § 287.7(d).

28.      Unlike a warrant for criminal arrest, the Form I-247A is not supported by any probable cause determination by a detached and neutral judicial officer.  Nor is it supported by a sworn, particularized showing of probable cause that the subject is a noncitizen and removable under federal immigration law.

29.      Instead, an ICE detainer is a fill-in-the-blank form issued by a rank-and-file immigration enforcement officer with check-boxes listing generic potential sources of information, which indicates that the individual is removable from the United States.

30.      According to ICE's policy, any request for a detainer must be supported by "probable cause" deriving from one of the following four sources: (1) a final order of removal, (2) pendency of ongoing removal proceedings, (3) biometric confirmation of the alien's identity and a records match in federal databases that indicate either by themselves or in addition to other information that the alien lacks lawful immigration status or is removable, or (4) statements made voluntarily by the alien to ICE immigration officers that indicate the same.  *See* ICE Policy 10074.2, § 5.1.

31.      Section 287(d) of the INA, which codified the limited use of detainers in 1985, is the only section that refers to "detainers." It provides that, in the event of a controlled substances arrest, the arresting agency may request immigration officials to issue a detainer.  This provision—the sole reference to "detainers" in the INA—does not give LLEAs the power to arrest.

7

32.     Prior to that codification, the common practice was for LLEAs to use detainers only to *notify* federal authorities of an anticipated release.  The detainer forms at the time specifically stated that they were "for notification purposes only" and simply alerted federal officials that if they wanted to take an individual into custody to pursue deportation, they had to immediately do so.  The historically-codified use of detainers was nothing like the current practice of ICE officials requesting that LLEAs physically retain custody of an individual past the time that they would otherwise be entitled to release.

**C.     Administrative Warrants**

33.     In March 2017, ICE announced a policy directive with a new version of the detainer form and instructions for using it. The directive requires that ICE attach an "administrative warrant" with its detainers that is signed by an ICE officer that affirms probable cause of an individual's removability.

34.     This new procedure was an empty advancement.  Administrative warrants, like the detainers themselves, are issued and approved by *immigration enforcement officials*. As a result, they suffer from the same infirmities as detainers; namely, the administrative warrants are not reviewed by a neutral magistrate to determine if they are based on probable cause.  Furthermore, administrative warrants are directed to immigration officers empowered to make arrests for civil immigration offenses, not local law enforcement such as Defendant MDCR. The administrative warrants do not provide evidence of suspicion that the individual at issue has committed a new criminal offense for which he or she could be lawfully detained in custody.

**D.     Miami-Dade County's Immigrant Past, Present, and Future**

35.     Miami-Dade is an international hub that owes its economic and cultural vibrancy to the on-going infusion of immigrants. Various waves of refugees and immigrants throughout the twentieth and twenty-first centuries have laid the foundation for a city unlike any other in the

WEIL:\96652573\6\99995.5951

United States. Today, South Florida thrives as it does—in agriculture, architecture, entrepreneurship, arts, music, cuisine, tourism, and more—because of its immigrant population.

36.     Indeed, Miami's immigrants drive economic growth and revitalization in the area. According to a report by Florida International University's Research Institute on Social and Economic Policy, undocumented immigrants contribute $437 million in local and state taxes to South Florida's economy. *See* Ali R. Bustamante, *Considering Tax Contributions from Undocumented Immigrants in Florida,* FIU Center for Labor Research & Studies (Feb. 2017), *available at* https://risep.fiu.edu/press-room/2017/risep-2017-undocumented-immigrant-tax-contributions/risep-2017-undocumented-immigrant-tax-contributions.pdf.   The same study also found that immigration enhances productivity, economic output, and innovation. *Id.*

### E.     Miami-Dade County's 2013 Resolution and Non-Compliance with Detainer Requests

37.     In recognition of the importance of the immigrant community to Miami-Dade County, the impact of detainers on children and families, the need for trust between communities and law enforcement, and the extraordinary cost to taxpayers to honor ICE detainer requests, Miami-Dade commissioners voted in 2013 to limit its response to ICE detainer requests. The effect of the resolution was to stop entirely the practice of arresting people upon request by ICE. *See* Miami-Dade Cty. Bd. of Comm'rs, Resolution 1008-13 (Dec. 3, 2013), *available at* http://www.miamidade.gov/govaction/legistarfiles/Matters/Y2013/132196.pdf.

38.     Plaintiffs WeCount! and FLIC invested significant resources and staff time advocating for this change in 2013.

39.     The Resolution became effective on December 13, 2013.  *Id.* at 6; *see also* Miami-Dade Home Rule Charter § 2.02(D) (providing the Mayor a ten-day veto period over "any legislative . . . decision of the Commission").

WEIL:\96652573\6\99995.5951

40.     Defendant MDCR—the department responsible for the County's jails—stopped holding individuals pursuant to ICE detainer requests in January 2014.

41.     The Board of County Commissioners ratified its position again in 2016 when it unanimously resolved to oppose statewide legislation that would require ICE detainers to be honored. *See* Miami-Dade Cty. Bd. of Comm'rs, Resolution 77-16 (Jan. 20, 2016), *available at* http://www.miamidade.gov/govaction/legistarfiles/MinMatters/Y2015/153028min.pdf.     The resolution recognized that since the County Commission adopted the County's detainer policy in 2013, "the taxpayers of Miami-Dade County have saved hundreds of thousands of dollars in costs that are unreimbursed by the federal government associated with honoring ICE detainer requests." *Id.* at 4.

42.     The Board's 2013 resolution also recognized that federal courts across the United States "have found that local law enforcement agencies that detain individuals on the sole authority of a detainer request violate the Fourth Amendment of the U.S. Constitution, exposing such agencies to legal liability unless there has been an independent finding of probable cause to justify detention." *Id.*  The Board noted that "a judge is not required to review or approve an immigration detainer," and that a detainer "may be issued by a single Immigration[] and Customs Enforcement officer when there are no immigration proceedings pending." *Id.* at 6.  This process, the Board recognized, "does not meet the U.S. Constitution's minimum standard for authorizing detention after an inmate is scheduled to be released." *Id.*  The Board thus opposed "legislation that would preempt policies set by th[e] Board related to immigration detainer requests." *Id.* at 8.

43.     For more than three years, MDCR dutifully followed the 2013 detainer policy enacted by the Board of County Commissioners.

WEIL:\96652573\6\99995.5951

**F.      Mayor Gimenez's 2017 Directive**

44.      Despite the positive impact of the County's prior policy, Miami-Dade has now changed its tune. In 2017, it began arresting people at the behest of ICE, separating them from their families, and inflicting hardship on valuable members of the Miami-Dade community.  On January 26, 2017, while other localities around the country filed suit in the wake of Executive Order 13768, Miami-Dade Mayor Carlos A. Gimenez issued a directive aimed at reversing Miami-Dade's 2013 policy and instructed the Miami-Dade Department of Corrections and Rehabilitation to "honor all immigration detainer requests." *See* Memorandum from Miami-Dade Mayor Carlos Giménez to Daniel Junior, Interim Director of Corrections and Rehabilitation, January 26, 2017, attached as Exhibit B.

45.      The Mayor's directive was not preceded by any public notice or opportunity for debate. Nor did it make any mention of the Board of County Commissioners' prior resolution to limit MDCR's authority to re-arrest people pursuant to ICE detainers.

46.      At a special meeting on February 17, 2017, the Miami-Dade Board of County Commissioners amended its 2013 resolution and ratified the Mayor's directive.  The amended resolution directed the Mayor "to ensure that, related to immigration detainer requests, Miami-Dade County . . . is cooperating with the federal government to the extent permissible by law." Miami-Dade Cty. Bd. of Comm'rs, Resolution 163-17 (Feb. 17, 2017), attached as Exhibit C.

47.      Since January 26, 2017, MDCR has maintained a practice of re-arresting individuals pursuant to the Board's resolution after the time they would otherwise be released on the sole basis that the person is the subject of an ICE detainer request.

48.      In the first year of implementation alone, MDCR officials processed and re-arrested at least 882 individuals with ICE detainers. At the end of that first year, an additional 219 individuals remained in local custody awaiting their 48-hour hold period. *See* Miami-Dade County

Jail Population Statistics, ICE (Hold for Immigration) Report, Detainers Received Between 01/27/2017 to 2/02/2018.

49.     The County's detainer policy has resulted in exorbitant detention costs, borne by County taxpayers. Compliance with all ICE detainer requests may cost the Defendants—and thereby the citizens of Miami-Dade County—as much as $13 million per year, enough to fully fund vital public programs. *See The Cost of Complicity* (February 2018), attached as Exhibit D. at 7, 10.

50.     Not only is the County's detainer policy costly, but courts have found that Executive Order 13768—the impetus for adopting a new detainer policy—is unlawful.   A California federal court has issued a permanent nationwide injunction against enforcement of Executive Order 13768, prohibiting the Department of Justice from withholding federal funds from jurisdictions it designates as "sanctuary." *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1202, 1212–13 (N.D. Cal. 2017). And just recently, in April 2018, a three-judge appellate panel in Chicago similarly upheld a nationwide injunction against making federal grant funding contingent on cooperation with immigration enforcement. *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018). Thus, the Defendants' actions were not only unnecessary and costly, but also illegal.

51.     Further, as of January 5, 2018, the Miami Herald reported that the Trump Administration's promises of "more money for crime fighting" that was supposed to come to Miami-Dade County as a reward for honoring ICE detainers has not materialized.  *See* Douglas Hanks, *A year after obeying Trump on immigration, Miami-Dade still waiting for a windfall* (Jan. 5, 2018), *available at http*://www.miamiherald.com/news/local/community/miami-dade/article193110964.html.   By contrast, the City of Chicago, like most others with sizable immigrant histories and populations, has refused to honor the ICE detainers. The City of Chicago

WEIL:\96652573\6\99995.5951

is suing the Trump administration over the very threat to withhold federal funds for "sanctuary cities" that spurred Miami-Dade County to change its detainer policy. Nevertheless, Chicago has received the same $3 million police grant from the Department of Justice that Miami-Dade did. *See id*.

**G.     Miami-Dade's Current Detainer Practice and its Widespread Negative Impact**

52.     Once Miami-Dade correctional officials are alerted of a detainer request issued by ICE, the detained person's jail card is marked with the phrase "immigration hold" or "immigration detainer."

53.     MDCR officers announce in open court when people in their custody are subject to ICE detainers.

54.     According to Jail Population Statistics produced by the Miami-Dade Corrections and Rehabilitation Department, 882 people in 2017 and 219 in 2018 (as of 02/02/2018) were re-arrested pursuant to an ICE detainer. That is nearly 1,000 individuals re-arrested pursuant to unlawful ICE detainers in a single year.  Further, of the 882 people that were held previously, records indicate that 382 were ultimately released to the public, while 500 were released directly to ICE.

55.     From the moment that an individual's jail card is marked to indicate an ICE detainer, MDCR treats the detained person as if he or she is not eligible for release.

56.     The practice of treating everyone with an ICE detainer as ineligible for release has immediate and dire effects.  People with ICE detainers are often denied the right to pay the standard bond amount. Inmates subject to an ICE detainer become ineligible for house arrest or a diversion program. When detained persons or their family and friends ask about a detained person's eligibility for bond or try to post bond, MDCR officers regularly announce that the detained person

WEIL:\96652573\6\99995.5951

will not be released because of the detainer. As a result of the ICE detainers, some bond companies will not post bond.

57.     The practice of honoring ICE detainers has also created a pervasive environment of fear amongst immigrants, their families, and their communities. The immediate effect of this fear is fewer reports of crime to law enforcement and, relatedly, a decline in overall community safety. Other large cities around the country with a similar immigrant population to Miami, including Los Angeles, Houston, and Denver, have reported significant drop-offs in reports by Latinos and Hispanics of sexual assaults and rapes out of fear that reporting and prosecuting such assaults will result in their own deportations.

**H.  Unlawful Arrest and Detention of S.C.C.**

58.     S.C.C. is a member of the Miami-Dade County community who is being unlawfully detained in MDCR custody pursuant to an ICE detainer.

59.     S.C.C. is a resident of unincorporated Miami-Dade County, Florida.

60.     S.C.C. is the owner and operator of a landscaping company that has served South Florida for over fifteen years. S.C.C. employed a dozen people before being forced to shut his business down as a result of his arrest and detention pursuant to an ICE detainer.

61.     S.C.C. previously obtained a commercial driving license and a standard driver's license.

62.     S.C.C. kept his license on him for identification purposes and maintained insurance on his vehicle.

63.     S.C.C. needs to use his vehicle to run his business and accomplish basic life sustaining tasks.

WEIL:\96652573\6\99995.5951

64.     On June 6, 2018, Miami-Dade police stopped and arrested S.C.C. for driving with a suspended license and for driving without a valid license. The officers took S.C.C. to Metro West Detention Center.

65.     At his arraignment, S.C.C. was not placed in a diversion program due to Defendants' policy and practice of acceding to ICE's detainer requests. A copy of S.C.C.'s immigration detainer form, redacted to protect S.C.C.'s privacy, has been attached as Exhibit A.

66.     S.C.C. was not eligible for pretrial release due to Defendants' policy and practice of acceding to ICE's detainer requests.

67.     As a result of Defendants' policy and practice of acceding to ICE's detainer requests, S.C.C. remained in Miami-Dade custody for over a month awaiting trial.

68.     On July 16, 2018, S.C.C. was scheduled for trial. After the state attorney requested a continuance in his case, the judge reduced S.C.C.'s bail to $1 per charge for a total bail of $2.

69.     On July 20, 2018, the $2 bail was paid on behalf of S.C.C.

70.     S.C.C.'s criminal custody came to an end upon payment of the $2 bail.

71.     Defendants, however, did not release S.C.C. when his criminal custody came to an end.

72.     Instead, Defendants re-arrested S.C.C.

73.     Defendants are now holding S.C.C. solely on the basis of the detainer request issued by ICE.

I.     **Unlawful Arrest and Detention of C.F.C. Pursuant to 2017 Directive**

74.     C.F.C. is a member of the Miami-Dade County community who is currently in ICE custody after being unlawfully detained pursuant to an ICE detainer.

75.     C.F.C. is a resident of Miami-Dade County.

76.     C.F.C. is the president of a local business she co-founded with her partner in 2014. C.F.C. and her partner harvest crops, including vegetables, for bodegas in and around Homestead.

77.     C.F.C. came to Miami-Dade County to escape a previous, abusive marriage and to seek safety for herself and her son, who was 15 years old at the time.

78.     C.F.C. currently has eight children. Three of her children, ages eleven, seven, and five, are U.S. citizens. C.F.C. also adopted a son, age seventeen. C.F.C.'s remaining four children are ages thirty, twenty-six, and nineteen. Two of these children were granted asylum in the United States. One of C.F.C.'s sons was tragically murdered after being deported from the United States.

79.     On the day before Mother's Day, May, 12, 2018, C.F.C. was shopping at BJ's in Homestead with her pregnant daughter and her youngest son, who is five years old.

80.     As C.F.C. was leaving BJ's, she was involved in a minor accident in the parking lot.

81.     The individuals in the other car jumped out of the vehicle and became aggressive, yelling at C.F.C., telling her to "go back to Mexico!" Ultimately, the police were called.

82.     The Homestead Police Department arrived and spoke with C.F.C. and the other driver. The Homestead Police then arrested C.F.C. for driving without a license. Homestead police then took C.F.C. into Defendants' custody.

83.     C.F.C.'s family posted bond the same day she was arrested.

84.     C.F.C. was told by an agent of the Defendants that she would be released at 4 p.m. that same day, May, 12, 2018.

85.     Defendants did not release C.F.C. Instead, Defendants re-arrested C.F.C. on the ICE detainer.

WEIL:\96652573\6\99995.5951

86.     On or about May 14, 2018, C.F.C. was taken into immigration custody at the Broward Transitional Center, where she currently remains.

87.     As a result of her re-arrest, C.F.C. missed the birth of her grandchild.

**J.     Debilitating Impact on WeCount! and Its Members**

88.     Because of the Defendants' unlawful decision to honor federal ICE detainer requests in response to the Trump Administration's threats, members of WeCount!, including C.F.C., in Miami-Dade County have been unlawfully detained or now fear being detained by the Defendants.

89.     In response to the Defendants' unlawful conduct detailed herein, WeCount! has been forced to divert its scarce resources to address and counteract this unlawful conduct, at the expense of WeCount!'s regularly-conducted programs and activities.

90.     WeCount! has expended staff time and resources counseling members, locating members who have been unlawfully detained under the Defendants' policy, searching for attorneys to represent members, and consoling affected family and community members.  WeCount! has also diverted resources to inform and educate the public about the Defendants' ongoing unlawful conduct.

91.     As a result of the Defendants' policy change, WeCount! has had more members of the organization and the local community come to them with immigration issues, and it has had to spend more time assisting and supporting these individuals.

92.     WeCount! also had to expend resources to confer with other community leaders and coalition partners to combat the Defendants' unlawful policy and practices.

93.     The day after Mayor Gimenez's directive, WeCount! coordinated a demonstration at County Hall, held several community meetings, and encouraged several other organizations to

share their stories at the Board of County Commissioners meeting. As a direct result of that work, WeCount! had to divert resources from regularly-conducted programs and activities.

94.     Responding to the new policy has prevented WeCount! from being fully available as it otherwise would be to educate the community on other pressing issues, provide support for victims of workplace abuses, and grow its local radio programming.

95.     Defendants' unlawful policy and practices are in direct conflict with WeCount!'s mission of supporting the immigrant community of Homestead. Defendants' unlawful policy and practices have caused WeCount! to divert resources and have impaired WeCount!'s ability to fully engage in other programs and activities that advance its mission.

96.     Accordingly, WeCount! sues on its own behalf as well as on behalf of its members who were, and continue to be, affected by the Defendants' unlawful behavior and who have standing to sue on their own. The interests that WeCount! seeks to protect are germane to its purpose. Neither the claims asserted nor the relief requested by WeCount! require the participation of individual members in the lawsuit.

**K.      Debilitating Impact on Florida Immigrant Coalition and Its Members**

97.     Because of the Defendants' unlawful decision to honor federal ICE detainer requests, constituents and individuals who are members of FLIC's member organizations have been unlawfully detained or now fear being detained by the Defendants.

98.     In response to the Defendants' unlawful conduct detailed herein, FLIC has been forced to divert its scarce resources to address and counteract this unlawful conduct, at the expense of FLIC's regularly-conducted programs and activities.

99.     FLIC has expended resources analyzing the Defendants' policy, counseling its members, meeting and consulting with law enforcement leaders, and searching for attorneys to represent individuals held on detainers who are members of FLIC organizations.

100.    FLIC also had to expend resources to confer with other community leaders and coalition partners to combat the Defendants' unlawful policies and practices.

101.    The day after Mayor Gimenez's directive, FLIC assisted in a demonstration at County Hall, held several community meetings, and coordinated with several other organizations to share stories at the Board of County Commissioners meeting.

102.    Because of the Defendants' unlawful policy and practices, FLIC has been forced to divert resources from efforts to assist individuals with citizenship applications, as well as policy initiatives to address the lack of driver's licenses available to undocumented immigrants.

103.    Responding to the Defendants' policy has also prevented FLIC from being fully available to educate the community on other pressing issues.

104.    Defendants' unlawful policy and practices are in direct conflict with FLIC's mission of supporting immigrant families, organizations, and communities. Defendants' unlawful policy and practices have caused FLIC to divert its resources and have impaired FLIC's ability to fully engage in other programs and activities that advance its mission.

105.    Accordingly, FLIC sues on its own behalf as well as on behalf of its members who were, and continue to be, affected by the Defendants' unlawful behavior and who have standing to sue on their own. The interests that FLIC seeks to protect are germane to its purpose. Neither the claims asserted nor the relief requested by FLIC require the participation of individual members in the lawsuit.

WEIL:\96652573\6\99995.5951

## CLASS ALLEGATIONS FOR EQUITABLE RELIEF

106.    Plaintiffs seek class-wide injunctive and declaratory relief pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) on behalf of a class.

### 1.    The ICE Detainer Equitable Relief Class

107.    Equitable Relief Class One (hereafter, and in the course of this litigation, also referred to as the "ICE Detainer Equitable Relief Class") is defined as all persons who, since January 26, 2017, (1) are or will be detained in the custody of MDCR, (2) have an ICE detainer placed on them by ICE while in MDCR custody that was not supported by a judicial warrant, (3) are entitled to be released from MDCR custody under applicable federal, state, or local law, and (4) due to MDCR's detainer policy and practice are not released but instead re-arrested and held in MDCR custody after being eligible for release from MDCR custody.

### a.    Numerosity

108.    The class meets the numerosity requirement of Rule 23(a)(1). In the first year of implementation, approximately 1,000 individuals were or are confined in the Miami-Dade County Jail under an ICE detainer. Therefore, on average almost 20 people every week are re-arrested and detained by MDCR after they would otherwise be entitled to release, solely due to Defendants' ICE detainer policy and practice.  The last available count from County data (current through the first few days of February 2018) shows more than 200 individuals in MDCR custody awaiting an unlawful re-arrest pursuant to an ICE detainer. Given this rate, the number of class members is likely higher by the time of this filing. The membership of the class continuously changes, rendering joinder of all members impracticable. The inclusion of future individuals in the class also makes joinder of all members impracticable.

WEIL:\96652573\6\99995.5951

b.       Commonality

109.    The class meets the commonality requirement of Rule 23(a)(2). Questions of law and fact presented by the named plaintiff are common to other members of the class. The common contentions that unite the claims of the class include the following:

- The practice of re-arresting and holding class members in the Miami-Dade County jails after they are otherwise entitled to release on the basis of an ICE detainer violates the Fourth  and Fourteenth Amendments of the United States Constitution;

- The practice of re-arresting and holding class members in the Miami-Dade County jails after they are otherwise entitled to release on the basis of an ICE detainer violates state common law protections against false imprisonment;

- The practice of re-arresting and holding class members in the Miami-Dade County jails after they are otherwise entitled to release on the basis of an ICE detainer violates Article I, Section 9 (the due process clause) of the Florida Constitution.

- The practice of re-arresting and holding class members in the Miami-Dade County jails after they are otherwise entitled to release on the basis of an ICE detainer constitutes an unreasonable seizure under Article I, Section 12 of the Florida Constitution.

c.       Typicality

110.    The claims of S.C.C. are typical of those of the class as a whole because he is currently being held under an ICE detainer that is not supported by a judicial warrant and he is eligible for release, but he is being detained by Defendants for at least 48 hours as a result of an ICE detainer.

WEIL:\96652573\6\99995.5951

d.      Adequacy of Representation

111.    S.C.C. is an adequate class representative and thus meets the requirements of Rule 23(a)(4). He is presently in MDCR custody and was entitled to release after bail was posted on July 20, 2018, but is still being detained on account of Defendants' policy and practice regarding ICE detainers. He has no conflict of interest with other class members. He will also fairly and adequately protect the interests of the class, and understands his responsibilities as a class representative.

112.    If by the time this Complaint is reviewed, S.C.C. is no longer in MDCR custody, he may still represent the class because his harm is "capable of reputation yet evading review." *See generally Tucker v. Phyfer*, 819 F.2d 1030, 1034 n.4 (11th Cir. 1987) (noting a named plaintiff can represent a class even if him claims become moot as long as his harm is "capable of repetition, yet evading review") (citing *Sosna v. Iowa*, 419 U.S. 393, 557–58 (1975)); *see also McKinnon v. Talladega County*, 745 F.2d 1360, 1364 (11th Cir. 1984) (finding that a plaintiff can represent a class for injunctive relief and damages even if his injunctive relief claims are moot because his claims for damages are not, thus giving him the "requisite adverseness" to represent the class for both types of relief). There is no indication that Miami-Dade County will stop this unlawful process of honoring ICE detainer requests; therefore S.C.C., and the members of the class he represents, may and will continue to be subject to this harm in the future.

**CLASS ALLEGATIONS FOR DAMAGES**

113.    Plaintiffs also bring damages claims based on federal and supplemental state law claims, including under 42 U.S.C. § 1983, seeking class-wide relief pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the Damages Class alleged below.

### 1.    The ICE Detainer Damages Class

114.    Damages Class One (hereafter and in the course of this litigation also referred to as the "ICE Detainer Damages Class") is defined as persons who, since January 26, 2017, and continuing until the practice has ceased or until entry of judgment, whichever is sooner, have been or will be (1) detained in the custody of the MDCR, (2) have an ICE detainer placed on them by ICE while in MDCR custody that was not supported by a judicial warrant, (3) entitled to be released from MDCR custody under applicable federal or state law, and (4) due to Defendants' policy and practice on ICE detainers are not released but are instead held in MDCR custody after they were eligible for release from MDCR custody.

### 2.    The Damages Classes Meet the Requirements of Federal Rule of Civil Procedure 23(a)

115.    Damages Classes One meets the requirements of Rule 23 as follows.

### a.    Numerosity

116.    Damages Classes One meets the numerosity requirement of Rule 23(a)(1). There are approximately 1,000 inmates confined in Miami-Dade County jails each year who are being or will be detained by MDCR after they would otherwise be entitled to release on the sole basis of an ICE detainer. Miami-Dade County records entitled "ICE – Released Defendants" list over 800 individuals who have been subject to ICE detainers and re-arrested between January 26, 2017, and February 2, 2018. Their records further show that the County billed the federal government for ICE detainers of at least 369 individuals re-arrested on ICE detainers between January 31 and December 31, 2017.

WEIL:\96652573\6\99995.5951

   b.  Commonality

117. The classes meet the commonality requirement of Rule 23(a)(2). Questions of law and fact presented by the named plaintiffs are common to other members of the class. The common contentions that unite the claims of the class include the following:

- The policy and practice of holding class members in the Miami-Dade County jails after they are otherwise entitled to release on the basis of an ICE detainer violates the Fourth and Fourteenth Amendments to the United States Constitution.

- The policy and practice of holding class members in the Miami-Dade County jails after they are otherwise entitled to release on the basis of an ICE detainer violates the due process clause of the Fourteenth Amendment of the United States Constitution.

- The policy and practice of holding class members in the Miami-Dade County jails after they are otherwise entitled to release on the basis of an ICE detainer violates state common law protections against false imprisonment;

- The practice of holding class members in the Miami-Dade County jails for 48 hours or more after they are otherwise entitled to release on the basis of an ICE detainer violates Article I, Section 9 (the due process clause) of the Florida Constitution.

- The practice of holding class members in the Miami-Dade County jails for 48 hours or more after they are otherwise entitled to release on the basis of an ICE detainer constitutes an unreasonable seizure under Article I, Section 12 of the Florida Constitution.

WEIL:\96652573\6\99995.5951

c.      Typicality

118.    Plaintiff C.F.C. meets the typicality requirement of Rule 23(a)(3) since, as alleged below, the claims of the Plaintiff C.F.C. are typical of those of the class.

119.    Plaintiff C.F.C. posted bond but was held beyond the expiration of any state law basis to detain her.

d.      Adequacy of Representation

120.    Plaintiff C.F.C. is an adequate class representative and thus meets the requirements of Rule 23(a)(4). She will adequately protect the interests of the class as they benefit from a finding of liability as all other members do. Plaintiff C.F.C. also has no conflict of interest with other class members, she will fairly and adequately protect the interests of the class, and she understands her responsibilities as a class representative.

121.    Plaintiffs incorporate paragraphs 1 to 112 above, regarding the parallel ICE Detainer Equitable Relief Class. Except for the fact that the Damages Class Representative is out of custody, the allegations contained in the aforementioned paragraphs apply as well to the Damages Class Representatives. Damages Class One meets the requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—for the reasons illustrated above.

**3.      The Damages Class Also Meets the Requirements of Federal Rule of Civil Procedure 23(b)(3).**

122.    Damages Class One meets the requirements of Federal Rule of Civil Procedure 23(b)(3).

a.      Predominance of Common Questions

123.    The questions of law or fact common to class members predominate over any questions affecting only individual members because the predominant issue for all class members

is whether there exists or existed a policy or practice of refusing to release class members otherwise entitled to release on the basis of an ICE detainer.

124.    The predominance of those issues for each damages class is sufficient to certify the class under Rule 23(b)(3) pursuant to the provisions of Federal Rule of Civil Procedure 23(c)(4), which authorizes the certification of a class "with respect to particular issues," even if there are other issues to be tried individually.

b.    Superiority

125.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Most of the class members were detained unlawfully for sufficiently few days that an individual lawsuit for such damages is not economically viable, given the complexity of the issues and the fact that attorneys are unlikely to take on such cases individually. The great majority of class members accordingly do not have an individual interest in controlling the prosecution of the case.

126.    General damages inherent to the U.S. constitutional or Florida law violations can be proven on a class-wide basis. Individual (special) damages, to the extent a class member chooses to pursue them, would be proven on an individual basis under procedures to be set by the Court.

127.    Because the class is confined to those individuals for whom there should be computerized or other jail records that will show, *inter alia*, the date of arrest, an ICE detainer was placed on a person, the date of the ICE detainer, the date the person was entitled to release absent the ICE detainer, and the date of release or transfer to ICE, identifying the universe of likely class members will be readily accomplished based on jail (and possibly Florida court, if needed) records.

WEIL:\96652573\6\99995.5951

128.     Thus, the proposed class is manageable, and without class treatment the overwhelming majority of class members would not have a viable individual claim.

### CAUSES OF ACTION

### COUNT I
### Fourth Amendment Violation (42 U.S.C. § 1983)
### Damages and Declaratory Judgment

129.     Plaintiff incorporates paragraphs 1 to 128 as if fully stated herein.

130.     Defendants illegally detained Plaintiffs and those individuals similarly situated by re-arresting them after the legal grounds for custody expired, solely because Defendants received an ICE detainer requesting their continued detention.

131.     Defendants illegally detained Plaintiffs and those individuals similarly situated pursuant to official action by Miami-Dade County beginning on January 26, 2017, which requires MDCR to "honor all immigration detainer requests."  Since then, MDCR has engaged in a policy and practice of detaining all individuals subject to an ICE detainer beyond the time they would otherwise be entitled to release.  Defendants' illegal acts of re-arresting and holding Plaintiffs was therefore made under color of state law.

132.     Defendants have unlawfully detained Plaintiff S.C.C. by currently holding him past the point where he was entitled to lawful release.

133.     Defendants have unlawfully detained members of WeCount!, including but not limited to, Plaintiff C.F.C., pursuant to this policy and practice. On information and belief, Defendants have unlawfully detained constituents of FLIC pursuant to this policy.

134.     Because of Defendants' actions, Plaintiffs and those individuals similarly situated suffered violations of the Fourth Amendment to the U.S. Constitution, which prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon

WEIL:\96652573\6\99995.5951

probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Pursuant to the incorporation doctrine, the due process clause of the Fourteenth Amendment makes the Fourth Amendment applicable to local governments. *See*, *e.g.*, *Mapp v. Ohio*, 367 U.S. 643 (1961) (freedom from unreasonable search and seizure); *Aguilar v. Texas*, 378 U.S. 108 (1964) (warrant requirement).

135.    Continued detention by non-federal officials of an individual based on an ICE detainer, after the grounds supporting the initial arrest have disappeared, is a new arrest for constitutional purposes. *Morales v. Chadbourne,* 793 F.3d 208, 217 (1st Cir. 2015); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1005 (N.D. Ill. 2016); *Miranda-Olivares v. Clackamas Cnty.*, No. 3:12–cv–02317–ST, 2014 WL 1414305, at *10 (D. Or. Apr. 11, 2014) (Where a "continued detention exceed[s] the scope of the Jail's lawful authority over the released detainee," the detention "constitute[s] a new arrest, and must be analyzed under the Fourth Amendment.").

136.    "[A] fair and reliable determination of probable cause" must be provided "as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 142 (1979). However, Defendant MDCR does not detain individuals pursuant to a written cooperative agreement with the federal government. Its officials are not deputized as federal immigration officials and they have not received adequate training in immigration law to independently assess the basis for detaining arresting individuals pursuant to immigration law. The requests on which they rely are not warrants issued by detached and neutral magistrates.

137.    As a proximate and reasonably foreseeable result of Defendants' actions, Plaintiffs and those similarly situated suffered injuries including financial loss, pain and suffering, humiliation, and emotional harm.

**COUNT II**
**Violation of Fourteenth Amendment (42 U.S.C. § 1983)**
**Damages and Declaratory Relief**

138.     Plaintiffs incorporate paragraphs 1 to 137 as if fully stated herein.

139.     Defendants falsely imprisoned Plaintiffs S.C.C. and C.F.C., and those individuals similarly situated, by violating the due process clause of the Fourteenth Amendment to the U.S. Constitution and committing the common law tort of false imprisonment. *See Campbell v. Johnson,* 586 F.3d 835, 840 (11th Cir. 2009).

140.     Defendants also held Plaintiffs after they were no longer in lawful custody on state criminal charges.

141.     The Fourteenth Amendment Due Process Clause includes the "right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Id*. at 840 (citing *Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir.1993), *modified on other grounds*, 15 F.3d 1022 (1994)). Defendants intended to confine Plaintiffs and detained them with deliberate indifference to their false imprisonment. Defendants were aware of a risk of serious harm and disregarded that risk by actions beyond mere negligence. Plaintiffs were aware of their confinement. C.F.C. posted bail and rather than being released was re-arrested. S.C.C. was held in jail for an additional month due to Defendants' policy and practice regarding ICE detainers. As alleged in Count III and incorporated herein, Defendants were not empowered under Florida law and lacked any other authority to detain Plaintiffs or individuals similarly situated based on a civil immigration violation.

142.     The Defendants are required to release the Plaintiffs and those similarly situated when they post bail for their state law violations. By denying the Plaintiffs and those similarly

WEIL:\96652573\6\99995.5951

situated the opportunity to post bail when an ICE detainer is lodged against them, the Defendants detain them after the Defendants knew those individuals were entitled to release.

143.    Defendants have unlawfully detained members of WeCount!, including but not limited to, Plaintiff C.F.C., pursuant to this policy. On information and belief, Defendants have unlawfully detained constituents of FLIC pursuant to this policy.

144.    It has been established that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." *Arizona v. United States*, 567 U.S. 387, 413 (2012); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

145.    Absent extraordinary circumstances, detaining an individual for over 48 hours prior to a judicial determination of probable cause violates the Fourth Amendment. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).

146.    As a proximate and reasonably foreseeable result of Defendants' actions, Plaintiffs suffered injuries, including financial, pain and suffering, humiliation, and emotional harm.

**COUNT III**
**Florida Unlawful Imprisonment**
**Damages and Declaratory Relief**

147.    Plaintiffs incorporate paragraphs 1 to 146 as if fully stated herein.

148.    Defendants detained Plaintiffs S.C.C. and C.F.C., and those individuals similarly situated, without any authority, thereby unlawfully imprisoning them in violation of Florida law. Defendants lacked a judicial warrant to detain them and had no authority to make a warrantless arrest. *See* FLA. STAT. § 901.15 (2018).

149.    Defendants unlawfully detained Plaintiffs and those individuals similarly situated against their will and without legal authority or "color of authority," which was unreasonable and

WEIL:\96652573\6\99995.5951

unwarranted under the circumstances.  *See Mathis v. Coats*, 24 So.3d 1284, 1289 (Fla. 2d DCA 2010).

150.    Defendants have unlawfully detained members of WeCount!, including but not limited to, Plaintiff C.F.C., pursuant to this policy. On information and belief, Defendants have unlawfully detained constituents of FLIC pursuant to this policy.

151.    MDCR employees are not law enforcement officers authorized to arrest without a warrant.  *See Pierre v. City of Miramar, Fla., Inc*., 537 Fed. Appx. 821, 824-25 (11th Cir. 2013) (holding that a county correctional officer is not a "law enforcement officer" for purposes of section 901.15(1)).

152.    Plaintiffs' detention was made pursuant to the Miami-Dade Board of County Commissioners' decision on February 17, 2017, which required MDCR to "honor all immigration detainer requests."

153.    Since the order, MDCR has detained individuals subject to an ICE detainer beyond the time they would otherwise be entitled to release.

154.    As a proximate and reasonably foreseeable result of Defendants' actions, Plaintiffs suffered injuries, including financial, pain and suffering, humiliation, and emotional harm.

155.    Pursuant to Fla. Stat. § 768.28(6), Plaintiff has provided the requisite administrative notice of his unlawful imprisonment claim.

**COUNT IV**
**Violation of Art. I, Sec. 12 of the**
**Florida Constitution (Searches and Seizure)**
**Damages and Declaratory Relief**

156.    Plaintiffs incorporate paragraphs 1 to 155 as if fully stated herein.

WEIL:\96652573\6\99995.5951

157.    Defendants detained Plaintiffs and those individuals similarly situated by continuing to hold them after the legal grounds for their custody expired, solely because Defendants received an ICE detainer requesting their continued detention.

158.    Furthermore, when Plaintiffs and those similarly situated are entitled to lawful release on their state law claims, they have been and are being held unlawfully pursuant to an ICE detainer, which constitutes another new seizure for which the Defendants lack probable cause or a warrant.

159.    Defendants have unlawfully detained members of WeCount!, including but not limited to, Plaintiff C.F.C., pursuant to these policies. On information and belief, Defendants have unlawfully detained constituents of FLIC pursuant to this policy.

160.    As a consequence of Defendants' actions, in addition to Fourth Amendment violations, Plaintiffs and those individuals similarly situated suffered violations of Art I., Section 12 of the Florida Constitution, which secures "[t]he right of the people to be secure in their persons…against unreasonable searches and seizures[.]" This right is construed in conformity with the Fourth Amendment.

161.    As a proximate and reasonably foreseeable result of Defendants' actions, Plaintiffs suffered injuries, including financial loss, pain and suffering, humiliation, and emotional harm.

**COUNT V**
**Violation of Art. I, Sec. 9 of the**
**Florida Constitution (Due Process)**
**Damages and Declaratory Relief**

162.    Plaintiffs incorporate paragraphs 1 to 161 as if fully stated herein.

163.    Defendants falsely imprisoned Plaintiffs and those individuals similarly situated by violating the due process clause of the Fourteenth Amendment to the U.S. Constitution and

committing the common law tort of false imprisonment, in addition to violating Article I, Section 9 of the Florida Constitution.

164.     Defendants have unlawfully detained members of WeCount!, including but not limited to Plaintiff C.F.C., pursuant to its policy and practice of detaining people on ICE detainers. On information and belief, Defendants have unlawfully detained constituents of FLIC pursuant to this policy.

165.     Article I, Section 9 guarantees that "[n]o person shall be deprived of life, liberty or property without due process of law …."

166.     When Plaintiffs and individuals similarly situated were and are entitled to be released from MDCR custody under applicable state law, they are nonetheless held pursuant to Defendants' policy and practice of honoring ICE detainers. Thus, the Defendants destroy the liberty interest Plaintiffs have in their lawful release.

167.     As a proximate and reasonably foreseeable result of Defendants' actions, Plaintiffs and those similarly situated suffered injuries, including financial loss, pain and suffering, humiliation, and emotional harm.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and:

- Issue an injunction enjoining Miami-Dade County and the Miami-Dade Department of Corrections from detaining individuals pursuant to ICE detainer requests, without a judicial warrant, or without probable cause that the detainee has committed a crime;

- Declare the Miami-Dade County Board of Commissioners' Resolution 163-17 facially invalid;

- Certify this action as a class action pursuant to Rule 23 of the Federal Rule of Civil Procedure;

- Declare that Defendants' detention of Plaintiffs and members of the proposed classes pursuant to ICE's detainer violated their Fourth Amendment right and rights under the Florida Constitution to be free from unreasonable seizure, violated their substantive due process right under the Fourteenth Amendment and under the Florida Constitution to be free from false imprisonment, and constituted unlawful imprisonment under Florida law;

- Award Plaintiffs and other members of the appropriate class compensatory damages;

- Award Plaintiffs and other members of the proposed classes reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

- Grant any other equitable relief this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

WEIL:\96652573\6\99995.5951

Dated:  July 20, 2018

Respectfully submitted,

*/s/ Edward Soto*
Edward Soto (Fla. Bar No. 0265144)
edward.soto@weil.com
Pravin R. Patel (Fla. Bar No. 0099939)
pravin.patel@weil.com
Corey D. Berman (Fla. Bar No. 0099706)
corey.berman@weil.com
Mark Pinkert (Fla. Bar No. 1003102)
mark.pinkert@weil.com
Nicole Comparato (Fla. Bar No. 0293239)
nicole.comparato@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Fax: (305) 374-7159

Alana Greer (Fla Bar No. 92423)
alana@communityjusticeproject.com
Oscar Londoño (Fla. Bar No. 1003044)
oscar@communityjusticeproject.com
**COMMUNITY JUSTICE PROJECT, INC.**
3000 Biscayne Blvd. Suite 106
Miami, Florida 33137
Tel: (305) 907-7697

Rebecca Sharpless (Fla. Bar No. 0131024)
rsharpless@law.miami.edu
**IMMIGRATION CLINIC – UNIVERSITY OF
MIAMI SCHOOL OF LAW**
1311 Miller Drive, Suite E-273
Coral Gables, FL  33146
Tel: (305) 284-3576
Fax: (305) 284-6092

WEIL:\96652573\6\99995.5951