# EXHIBIT D

# THE COST OF COMPLICITY

A FISCAL IMPACT ANALYSIS OF IMMIGRATION DETAINERS IN MIAMI-DADE COUNTY, FLORIDA

**COMMUNITY JUSTICE PROJECT
FLORIDA IMMIGRANT COALITION
WECOUNT!**



**FEBRUARY 2018**



# THE COST OF COMPLICITY

**DAYS AFTER DONALD TRUMP WAS SWORN INTO OFFICE, MIAMI-DADE COUNTY BECAME THE FIRST TO CAPITULATE TO HIS ANTI-IMMIGRANT AGENDA. BY AGREEING TO HONOR IMMIGRATION DETAINERS, MIAMI-DADE TURNED THEIR LOCAL JAILS INTO THE FIRST STOP IN A DEPORTATION PIPELINE. AS A RESULT, FAMILIES ARE BEING TORN APART AND LOCAL TAX-PAYERS ARE FOOTING THE BILL.**

# DEFINING DETAINERS

Immigration Detainers, sometimes called ICE Holds, are requests from the federal government to a local law enforcement agency to hold someone that U.S. Immigration and Customs Enforcement (ICE) suspects of violating civil immigration law. The hold lasts 48 hours after an individual would otherwise be released from local custody, such as when they post bail or their case is dismissed, and does not include weekends or holidays, which can increase the time in local custody even further. The local jurisdiction bears the direct cost of holding these individuals in local custody for 48 hours and the indirect costs, which, as described below, can end up costing millions of dollars per year.

Immigration detainers are not judicial warrants and do not provide probable cause for arrest by local officials. As ICE itself has affirmed,[1] they are simply requests, and complying with them is not mandatory. Most immigration violations are civil, not criminal, charges and Miami-Dade officials are not empowered to enforce immigration law--that power belongs exclusively to federal agents.

In 2013 the Miami-Dade Board of County Commissioners, as a result of community pressure, voted to end the County's practice of honoring immigration detainers unless the associated costs were covered by federal dollars and the individual was charged with certain serious offenses.[2] The County continued to participate in the Criminal Alien Program,[3] which allows immigration officials to take custody of individuals incarcerated after conviction.

# MIAMI-DADE'S REVERSAL

On Jan. 25, 2017, newly sworn in President Donald Trump issued a sweeping Executive Order[4] that threatened to cut federal funding from "sanctuary jurisdictions." Miami-Dade did not fall under the Executive Order's own narrow definition of sanctuary jurisdictions "that willfully refuse to comply with 8 U.S.C. 1373," a federal statute covering communications with federal authorities regarding immigration status. Honoring immigration detainers is not a requirement of this law and Miami-Dade was not in violation of the provision. In a separate section, the Executive Order announced that a list of jurisdictions who did not comply with detainer reports would be published weekly.

Less than a day later, Mayor Carlos Gimenez made Miami-Dade the first, and to our knowledge only, major county or city to voluntarily capitulate to Trump's anti-immigrant agenda. Gimenez issued a directive[5] to the Miami-Dade Department of Corrections to begin honoring all immigration detainers received from the U.S. Department of Homeland Security. On February 17, 2017, the Miami-Dade Board of County Commissioners passed a resolution[6] affirming the Gimenez-Trump policy and rolling back the 2013 policy, despite hundreds of residents testifying to the fear this would generate in immigrant communities and the harm it would do to police-community relations.[7]

# SCOPE OF IMPACT

In the first eleven months since the Gimenez-Trump policy was implemented, 966 immigration detainer requests were issued to Miami-Dade officials.[8] This results in significant economic losses for the County: an individual with an immigration detainer will spend an estimated 2.68 times as long in custody than those without one.[9] In Miami-Dade, that means an individual with a detainer will spend an average of 90 days in custody, compared to a 33 day average for those without a detainer.[10] As of December 28, 2017, 201 individuals with an immigration detainer were in County custody, more than double the number held six months prior. Miami-Dade's cost to jail an individual is roughly $230 per day.[11]

ICE's decision to pick up a detainee does not appear to correlate with the severity of the local criminal charge or purported public safety assessment. One detainee was turned over to ICE after the county court sentenced him to one day of probation. Rather than serving that probation, he was put into the deportation pipeline. Others have been turned over for simply not being able to obtain a driver's license. Unlike twelve other states, undocumented immigrants are barred from obtaining or renewing a driver's license in the state of Florida. Miami-Dade County recently approved civil citations for minor offenses, such as littering, loitering, possession of less than 20 grams of marijuana, and trespassing.[12] Yet, individuals are being turned over to ICE for these same charges. Regardless of the severity of the local criminal charge, it must be stressed that individuals in pre-trial detention have not been convicted - the charges for which they are being held have yet to be proven.

98% of individuals with detainers released to ICE by Miami-Dade had never had a previous offense.[13] Sixteen individuals with resolved detainers had no criminal charges listed in Miami-Dade records, and were simply designated as "Hold for Agency."[14] Three from that group were turned over to ICE. Overall, ICE officials have only picked up approximately 56% of the 765 individuals with a resolved immigration detainer.[15] Those ultimately released back into the community were still likely to endure significantly increased time in local custody as a result of the detainer.

> "IT IS A POLICY CHANGE THAT AFFECTS THE ENTIRE COMMUNITY. ... MANY OF THE PARENTS WHO DRIVE THEIR CHILDREN TO SCHOOL ARE AFRAID...IT IS VERY DIFFICULT FOR ME, AS A MOTHER."
>
> UNDOCUMENTED MOTHER



# FISCAL IMPACT

Rather than focusing simply on the cost of detention during the 48 hour hold, the analysis must be expanded to account for the true cost of prolonged stays in local custody. By multiplying the estimated additional time in local custody by the number of detainers issued and average daily cost of incarceration in Miami-Dade, we are able to assess the fiscal impact on the County. The result: Miami-Dade taxpayers have footed the bill for approximately $12.5 million dollars in additional jailing costs between Jan. 27 and Dec. 28, 2017. Extrapolated over a year, assisting ICE could end up costing the county over $13.6 million annually.

The Miami-Dade County Fiscal Year 2017 Budget Reports, which run through July 2017, show rising corrections costs as this policy came into effect. The first quarter of the fiscal year, before the implementation of the Gimenez-Trump policy, showed underspending in Corrections and Rehabilitation.[16] in year to date spending By contrast, the fourth quarter report shows $10,378,000 above the approved figures on the same line item.[17]

## THE GIMENEZ-TRUMP POLICY COSTS TOP $13,621,000 A YEAR

After the implementation of the Gimenez-Trump policy, the average daily population of individuals in custody in Miami-Dade County increased for the first time in eight years[18] despite steadily decreasing arrest rates. By honoring immigration detainers, the County not only added up to 48 hours per detainee, but dramatically increased the time they spend in custody, for multiple reasons.[19] Under Florida law, most criminal defendants have a right to pretrial release under reasonable conditions, either on their own recognizance or with bail.[20] Criminal defense lawyers and observers report that local courts now deny otherwise routine alternatives to incarceration for minor charges, including access to diversion programs and Pretrial Services, a "local county agency that releases persons, free of charge before their trial.", to individuals with a detainer.[21]

# "SINCE MR. GIMENEZ'S NEW POLICY, …THERE IS FEAR AMONG US. MANY HAVE LEFT [MIAMI] …BECAUSE THEY ARE AFRAID OF THE POLICE AND IMMIGRATION [ENFORCEMENT]."

**UNDOCUMENTED FATHER**

Family members attempting to post bail for loved ones have reported being turned away or strongly discouraged by corrections staff when an immigration hold is in place, and for good reason. Once in ICE custody, their loved one can be transferred anywhere in the country. Private bond agencies will generally not accept cases for individuals with immigration detainers in County custody, unless they are able to post the entire amount, rather than a standard ten percent bond. This puts the option out of reach for most working families. Even those who are able to post bail, secure a plea deal, or other resolution to the local charge have a strong incentive to remain in County custody rather than risk being turned over to ICE.

These pressures increase the time in local custody regardless of whether ICE ultimately decides to pick up the detainee or release them back into the community. During the first year of the Gimenez-Trump policy the average length of stay increased from 32.2 days a month before the policy was enacted[22] to 34.5 days a year later.[23] This figure continues to rise as of the publication of this report.[24]

Such a trend undermines bipartisan efforts at the local, state, and federal levels to end costly, ineffective, and racially disproportionate mass incarceration practices. In contrast to the jurisdictions across the country moving to end cash bail, and our own state legislature's proposals to prevent jail time, fines and fees for minor charges such as driving without a license, the Gimenez-Trump policy instead increases the burden on taxpayers and immigrant families.

These figures do not capture the litigation and liability costs to the County for holding individuals in violation of their constitutional rights. Lawsuits[25] have already been filed challenging the constitutionality of the practice in Miami-Dade. Individual cases in other jurisdictions have shown these claims can end up costing the County anywhere from $35,000 to $145,000 before adding in attorney's fees and costs.[26]  This liability falls solely on the shoulders of the County, as the Federal Government "is not liable and will not indemnify localities for any liability incurred while housing these detainees," according to an analysis by the Catholic Legal Immigration Network.[27]

THE RESOURCES NEEDED ANNUALLY TO IMPLEMENT THE GIMENEZ-TRUMP POLICY COULD INSTEAD:

FULLY FUND THE AFFORDABLE HOUSING TRUST;[28]

RESTORE MOST OF THE BUS ROUTES CUT IN THE LAST BUDGET, MANY OF WHICH SERVE LOW INCOME COMMUNITIES;[29]

INVEST IN DESPERATELY NEEDED CLIMATE RESILIENCE AND DISASTER PREPAREDNESS;

FUND CLOSE TO A MILE AND A HALF OF THE UNDERLINE PARK;[30]

FUND OVER HALF OF THE PETS' TRUST;[31]

OR

CREATE ROBUST PUBLICLY FUNDED IMMIGRATION DEFENSE FUNDS LIKE THOSE IN NEW YORK CITY[32] AND LOS ANGELES.[33]



# ARE FEDERAL FUNDS REALLY AT RISK?

Gimenez justified the reversal by citing the "$350 million in federal funding that we receive every year" and the "hundreds of millions, if not billions, of dollars for our transit system"[34] that the County would be seeking from the federal government, without fully acknowledging the legal restrictions on federal government funding decisions.

However, the administration quickly dashed any hopes of new transit funding for Miami-Dade[35], and serious legal questions about the administration's ability to withhold funds persist. The Executive Order is too ambiguous as to which funds are at risk, unlawfully conditions federal funds that do not have a nexus with the purpose of the federal program, and is unconstitutionally coercive. Moreover, a jurisdiction must be in violation of an applicable federal law (8 U.S.C. 1373, in this case) to be at risk and must have notice of its violation to give it time to change its practice before its funding is impacted. Refusing to honor detainer requests is not a violation of federal law. Even for those jurisdictions in violation of 8 U.S.C. 1373, the U.S. Attorney General walked back Trump's threat to withhold federal funding after a federal judge in San Francisco issued a temporary injunction[36] on the enforcement of Trump's Executive Order, ruling that the scope of the funding impacted by the Executive Order was ambiguous and too broad.

In an attempt to remedy the constitutional issues, Attorney General Jeff Sessions issued a memo[37] in which he clarified and narrowed the federal grants the administration was attempting to condition on compliance with their immigration agenda. The memo reaffirmed that "'sanctuary jurisdiction' referred only to jurisdictions that 'willfully refuse to comply with 8 U.S.C. 1373.'" Further, it clarified that the only federal funding that could be impacted by this Executive Order are "federal grants administered by the Department of Justice (DOJ) or the Department of Homeland Security." The DOJ echoed this position in court filings of a lawsuit challenging the constitutionality of Miami-Dade's detention of a Haitian immigrant[38] and later attempted to add specific criteria to the DOJ's Byrne Justice Administration Grant program. Miami-Dade County has received approximately $500,000 a year in past grant cycles from this program, a far cry from the hundreds of millions cited by Gimenez. Even with the guidance narrowing the federal funding potentially under threat, two federal judges ultimately blocked enforcement of the Executive Order, ruling it an unconstitutional attempt to usurp Spending Powers reserved for Congress and a violation of the Tenth Amendment.[39] In November 2017, the court in San Francisco permanently enjoined enforcement of the Executive Order.[40]

Miami-Dade's reversal of its detainer policy has not yielded any funding advantages, even in comparison to jurisdictions that loudly and proactively defended their sanctuary policies. In the most recent round of federal police funding, Miami-Dade received the same amount of funding awarded to Chicago, a city that vehemently defended its right to refuse detainer requests.[41] In the end, the County's actions seem only to have secured Gimenez the admiration of Jeff Sessions,[42] the unenviable endorsement of the Trump Twitter feed,[43] and a $13.6 million bill for local taxpayers to foot.

# COMMUNITY IMPACT

Miami-Dade County and neighboring areas are home to an estimated 151,000 immigrants who are immediately at risk of being funneled through local law enforcement to deportation proceedings under the Gimenez-Trump policy.[44] These include victims of human trafficking, domestic violence, wage theft, and other crimes who depend on trusting relationships with social service and public safety officials to escape abuse.

The Trump administration's decision to end the Temporary Protected Status (TPS) program for longtime Haitian immigrants puts an additional 24,000 TPS holders, currently living and working legally in South Florida, and their estimated 10,600 US-born children at risk in in 2019.[45] TPS holders from El Salvador and Nicaragua face the same risk, as they are pushed out of status over the next year and a half, while Hondurans await a decision in 2018. 11,400 South Florida DACA recipients[46] and an estimated 72,000 DACA-eligible but unenrolled youth statewide[47] will be at risk as their statuses begin to expire in March 2018.

Black immigrants are at increased risk under this policy, as over-policing and mass incarceration policies continue to target communities of color. A national study found that while only 7% of non U.S. citizens are Black, they represent over 20% of those facing deportation on criminal grounds.[48] The statistics are even more glaring locally where Black people make up over 22% of individuals in Miami-Dade custody with a detainer.[49] This disparity is particularly concerning given Trump's abhorrent comments about Haitians, a community that is integral to South Florida.

Even U.S. citizens are not safe from the Gimenez-Trump policy, as the questionable accuracy of the information ICE relies on to issue detainers has continued to create problems. A U.S. citizen was wrongfully held on a detainer in Miami-Dade this year,[50] a trend that has been seen across the country. A study found that almost 700 U.S. citizens have been wrongfully held in local custody because of immigration detainers in recent years.[51]

The indirect impact of this policy and the climate created by the Trump administration has been felt beyond the County coffers. Providers have noted a "chilling effect on Hispanic participation in health care programs,"[52] increased stress and mental health issues in immigrant patients, fearfulness around filing for court protection in domestic abuse cases[53] and a general fear of local law enforcement since the policy took hold. Lawyers also report that witnesses are failing to appear for depositions and court hearings out of fear, impairing the administration of justice and due process.

# METHODOLOGY

This report draws heavily from the work of Edward Ramos of Kurzban, Kurzban, Weinger, Tetzeli & Pratt, P.A. who published a similar analysis in 2013. We update the findings of that analysis with information from the 2017 calendar year under the Gimenez-Trump policy.

We update the cost of detention to roughly $230 per day to reflect the Miami-Dade Inmate Cost Per Day based on reporting from the Miami Herald.[54] In the eleven months following the Gimenez-Trump policy, from Jan. 27 to Dec. 28, 2017, there were 966 detainer requests in Miami-Dade County.[55] In the same period, 50,847 arrests were reported county wide.[56] We cite an average length of stay of 34.5 days from a Jan. 20, 2018 report reflecting data for the previous 180 days.[57] We continue to rely on the "detainer multiplier" of 2.68 used in 2013 derived from a study of comparing length of jail stays for those with immigration detainers and those without in multiple jurisdictions as outlined in Ramos' report.[58]

966 DETAINERS REPRESENT 1.9% OF THE 50,847 MIAMI-DADE BOOKINGS BETWEEN JAN. 27 - DEC. 28, 2017

X IS THE AVERAGE TIME IN LOCAL CUSTODY WITH A DETAINER
Y IS THE AVERAGE TIME IN LOCAL CUSTODY WITHOUT A DETAINER

.019 (X) + .981 (Y) = 34.5 AVERAGE LENGTH OF STAY IN MIAMI-DADE
X / Y = 2.68 DETAINER MULTIPLIER

X = 89.6 DAYS IN CUSTODY WITH A DETAINER
Y = 33.4 DAYS IN CUSTODY WITHOUT A DETAINER

89.6 - 33.4 = 56.2 ADDITIONAL DAYS IN CUSTODY WITH A DETAINER

56.2 ADDITIONAL DAYS * $230 DAILY COST * 966 DETAINERS = $12,486,516 OVER ELEVEN MONTHS
$12,486,516 / 11 MONTHS = $1,135,137.82 MONTHLY COST
$1,135,138 * 12 MONTHS = $13,621,653.80 ANNUAL COST



# ENDNOTES

1   Memorandum from County Attorney R.A. Cuevas, Jr. to Miami-Dade Mayor Carlos Gimenez, July 15, 2013

2   Resolution No. R-1008-13, Miami Dade County, December 3, 2013.

3   The Criminal Alien Program (CAP): Immigration Enforcement in Prisons and Jails, August 1, 2013, American Immigration Council

4   Executive Order 13768: Enhancing Public Safety in the Interior of the United States, January 25, 2017

5   Memorandum from Miami-Dade Mayor Carlos Gimenez to Daniel Junior, Interim Director of Corrections and Rehabilitation, January 26, 2017

6   Miami-Dade Board of County Commissioners Agenda & Video, Special Meeting, February 17, 2017
    Chairman Esteban Bovo, Vice Chairwoman Audrey Edmonson and Commissioners Bruno Barreiro, Jose "Pepe" Diaz, Sally Heyman, Joe Martinez, Dennis Moss, Rebeca Sosa, and Javier Souto voted to endorse. Commissioners Daniella Levine Cava, Jean Monestime, and Xavier Suarez stood with the community in opposition to the measure. Commissioner Barbara Jordan was not present.

7   Id.; Jerry Iannelli, Miami-Dade Commission Votes 9-3 to Make Mayor's Anti-Sanctuary-City Order Official, February 17, 2017, Miami New Times

8   Jail Population Statistics: ICE (Hold for Immigration) Report for In-Custody Inmates & Released Inmates, January 27 - December 28, 2017, MIami-Dade County Corrections and Rehabilitation Department

9   Edward Ramos, Fiscal Impact Analysis Of Miami-dade's Policy On "Immigration Detainers," 2013

10  See Methodology.

11  Douglas Hanks, County sends Trump the bill for holding immigration offenders. There's a discount., January 12, 2018, Miami Herald "Ryan Lafarga, business analyst at the county's Office of Management and Budget, wrote in a Jan. 10 internal email. 'The total amount billed for the four months is $24,408 for 216 inmate days. The actual cost, using the Inmate Cost Per Day figures for that same period, is $50,048.'" $50,048 / 216 = $231.70

12  Miami-Dade County Code Sec. 21-81(d)

13  Jail Population Statistics: ICE (Hold for Immigration) Report for Released Inmates, January 27 - December 28, 2017, MIami-Dade County Corrections and Rehabilitation Department

14  Id.

15  Id.

16  First Quarter Budget Report Fiscal Year 2016-17, Miami Dade County

17  Fourth Quarter Budget Report Fiscal Year 2016-17, Miami Dade County

18  Admissions & Average Daily Population Report 2017 Q2, Miami-Dade Corrections & Rehabilitation Department

19  For a deeper exploration of the circumstances and process surrounding detainers see: Andrea Guttin, The Criminal Alien Program: Immigration Enforcement in Travis County, Texas, February 2010

20  Florida Rules of Criminal Procedure, Rule 3.131 Pretrial Release

21  Frequently Asked Questions, Miami-Dade County Department of Corrections

| | |
|---|---|
| 22 | Average Length of Stay Over 180 Days, Daily Jail Population Statistics, December 21, 2017, Miami-Dade County Corrections and Rehabilitation Department |
| 23 | Average Length of Stay Over 180 Days, Daily Jail Population Statistics, January 20, 2018, Miami-Dade County Corrections and Rehabilitation Department |
| 24 | Average Length of Stay Over 180 Days, Daily Jail Population Statistics, updated daily, Miami-Dade County Corrections and Rehabilitation Department |
| 25 | Caitlin Dickerson, U.S. Citizen Detained by Mistake Sues Miami-Dade Over Immigration Enforcement, July 5, 2017, New York Times; David Ovalle, Judge shoots down Miami-Dade detention policy adopted to follow Trump deportation order, March 3, 2017, Miami Herald |
| 26 | What ICE Isn't Telling you About Detainers: A Fact Sheet for Local Law Enforcement Agencies, October 2012, ACLU<br>"In addition to the costs of detention, your agency faces the costs of legal liability if you choose to comply with ICE detainers. Detainer lawsuits are regular occurrences, and although the request comes from ICE, the choice to comply means a state, county, or city is liable for potential damages. In 2011, for example, Jefferson County in Colorado agreed to pay $40,000 after holding a man in jail for 47 days on an ICE detainer (well past the detainer's own time limit). In 2008, New York City agreed to pay $145,000 to settle a lawsuit by a man who was wrongly held on ICE detainers for a total of 140 days. And in 2010, Spokane County, Washington, agreed to pay a $35,000 settlement to a man who was wrongly held without bail for 20 days because of an ICE detainer." |
| 27 | The Cost of State & Local Involvement in Immigration Enforcement, Catholic Legal Immigration Network, Inc. |
| 28 | Carolyn Guniss, Affordable Housing Trust Fund only nets $387,000 from county, January 25, 2017, Miami Times |
| 29 | Douglas Hanks, Mayor finds money to reduce waits for Metrorail cars and reverse other cuts, September 27, 2017, Miami Herald |
| 30 | Megan Padilla, Miami puts it all on the line with new park project, December 27, 2017, Travel Weekly<br>"The total cost is projected at $10 million per mile, for a total of $100 million." |
| 31 | Elinor Brecher, Miami-Dade voters back creation of Pets' Trust, November 6, 2012, Miami Herald |
| 32 | Octavio Blanco, New York to provide lawyers for immigrants facing deportation, April 13, 2017, CNN |
| 33 | Susan Abram, LA County leaders approve millions for legal fund for immigrants facing deportation, June 21, 2017 Los Angeles Daily News |
| 34 | Douglas Hanks, Under Trump crackdown, 1,000-plus 'sanctuary' inmates could be detained in Miami-Dade, February 5, 2017, Miami Herald |
| 35 | Douglas Hanks, Trump wants to cut transit money needed for Miami-Dade's SMART Plan, May 23, 2017, Miami Herald |
| 36 | Vivian Yee, Judge Blocks Trump Effort to Withhold Money from Sanctuary Cities, April 25, 2017, New York Times |
| 37 | Memorandum on the Implementation of Executive Order 13768, May 22, 2017, Office of the Attorney General |
| 38 | Douglas Hanks, Trump administration: Miami-Dade rail funds were never at risk over 'sanctuary' policies, August 21, 2017, Miami Herald |
| 39 | Jason Meisner and John Byrne, Judge rules in city's favor on sanctuary cities, grants nationwide injunction, September 15, 2017, Chicago Tribune; Memorandum Opinion & Order in City of Chicago v. Sessions, Sept. 15, 2017; Sanctuary Jurisdiction Cases, US District Court for the Northern District of California |
| 40 | Order Granting Motion for Summary Judgment, Sanctuary Jurisdiction Cases, US District Court for the Northern District of California |
| 41 | Douglas Hanks, Miami-Dade obeyed Trump on immigration. Chicago didn't. Both got $3M police grants, November 20, 2017, Miami Herald |

| | |
|---|---|
| 42 | Rebecca R. Ruiz, Sessions Lauds Miami and Rebukes Chicago in Escalating Fight With Sanctuary Cities, August 16, 2017, New York Times |
| 43 | Donald Trump (@realDonaldTrump), "Miami-Dade Mayor drops sanctuary policy. Right decision. Strong!" January 26, 2017, Tweet |
| 44 | Unauthorized Immigrant Populations by Country and Region, Top States and Counties of Residence, 2010-14, Includes Miami-Dade and Monroe Counties, Migration Policy Institute. |
| 45 | Robert Warren and Donald Kerwin, Center for Migration Studies, A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti Journal on Migration and Human Security, 2017, Journal on Migration and Human Security |
| 46 | Approximate Active DACA Recipients, Leading Core Based Statistical Areas As of September 4, 2017, US Citizenship and Immigration Services |
| 47 | Deferred Action for Childhood Arrivals (DACA) Data Tools, DACA Recipients & Program Participation Rate, by State, 2017, Migration Policy Institute |
| 48 | The State of Black Immigrants, p. 19, BAJI & NYU Law Immigration Clinic |
| 49 | Analysis of Jail Population Statistics: ICE (Hold for Immigration) Report for In-Custody Inmates, January 27 - December 28, 2017, MIami-Dade County Corrections and Rehabilitation Department. 45 of 201 individuals were identified as Black. |
| 50 | Caitlin Dickerson, U.S. Citizen Detained by Mistake Sues Miami-Dade Over Immigration Enforcement, July 5, 2017, New York Times |
| 51 | Eyder Peralta, You Say You're An American, But What If You Had To Prove It Or Be Deported?, December 22, 2016, NPR "…An NPR analysis of data obtained through a Freedom of Information Act Request shows that hundreds of American citizens each year find themselves in a situation similar to Palma's. Those data show that from 2007 through July of last year, 693 U.S. citizens were held in local jails on federal detainers…." |
| 52 | Kelli Kennedy, Deportation fears have legal immigrants avoiding health care, January 21, Washington Post |
| 53 | Aric Chokey, Arrests of undocumented immigrants rise in Florida amid Trump crackdown, December 7, 2017, Sun Sentinel |
| 54 | Douglas Hanks, County sends Trump the bill for holding immigration offenders. There's a discount., January 12, 2018, Miami Herald. |
| 55 | Jail Population Statistics: ICE (Hold for Immigration) Report for In-Custody Inmates & Released Inmates, January 27 - December 28, 2017, MIami-Dade County Corrections and Rehabilitation Department |
| 56 | Open Data Portal, Jail Bookings, January 27 - December 28, 2017, Miami-Dade County |
| 57 | Corrections and Rehabilitation Department Daily Jail Population Statistics, January 20, 2018, Miami-Dade County |
| 58 | Ramos, p. 4-5 "As the reports from other jurisdictions noted in their analyses, those who were issued an ICE detainer spent a significantly longer time in jail than those who were not. The increase in the total number of additional days of detention caused by compliance with ICE detainers ranges from 20-73. From this data from each jurisdiction, the total "detention multiplier" for those subject to an ICE detainer was calculated by dividing the average number of days spent in detention for individuals subject to an ICE detainer by the average number of days spent in detention by individuals not subject to a detainer for individuals. Calculation and use of this "detention multiplier" (as opposed to merely the absolute difference in number of days spent) facilitates a more accurate cross-comparison of the effects of detainers across various jurisdictions by controlling for the differences in overall average jail time, which varies considerably from jurisdiction to jurisdiction. In each of the jurisdictions considered, the data was relatively consistent: it reflects that the detention period for individuals who are issued an ICE detainer is between double and triple that of individuals not issued detainers. …On average across the jurisdictions, a person with an ICE detainer spends 2.68 days in jail for every one day spent in jail by a person not subject to an ICE detainer." |

# ABOUT THE AUTHORS



COMMUNITY JUSTICE PROJECT IS A NON-PROFIT LEGAL ORGANIZATION FOCUSED ON BUILDING THE POWER OF MOVEMENTS FOR RACIAL JUSTICE AND HUMAN RIGHTS.
COMMUNITYJUSTICEPROJECT.COM



THE FLORIDA IMMIGRANT COALITION (FLIC) IS A STATEWIDE COALITION OF MORE THAN 65 MEMBER ORGANIZATIONS AND OVER 100 ALLIES, FOUNDED IN 1998 AND FORMALLY INCORPORATED IN 2004  FLIC IS LED BY OUR MEMBERSHIP — GRASSROOTS AND COMMUNITY ORGANIZATIONS,  FARMWORKERS, YOUTH, ADVOCATES, LAWYERS, UNIONS AND OTHERS.
FLORIDAIMMIGRANT.ORG



WECOUNT! IS A GRASSROOTS COMMUNITY-BASED ORGANIZATION IN HOMESTEAD. ITS MISSION: TO BUILD THE POWER OF THE LATIN AMERICAN IMMIGRANTS AND FARM WORKERS TO FULFILL THEIR ASPIRATIONS OF JUSTICE AND EQUALITY THROUGH EDUCATION, DEVELOPING LEADERS, ORGANIZING, CULTURAL WORK, BUILDING COALITIONS, AND COLLECTIVE ACTION.  IT LED THE CAMPAIGN TO PASS THE COUNTY'S ICE DETAINER POLICY IN 2013.
WE-COUNT.ORG

# ACKNOWLEDGEMENTS

THIS ANALYSIS WOULD NOT HAVE BEEN POSSIBLE WITHOUT THE ORGANIZATIONS AND INDIVIDUALS WHO LENT THEIR TIME AND EXPERTISE TO THE AUTHORS, AND ILLUMINATED THE EXPERIENCES OF INDIVIDUALS IMPACTED BY IMMIGRATION DETAINERS BEHIND BARS, IN THE COURT SYSTEM, AND IN THE COMMUNITY. AMONG THEM, WE THANK:

EDWARD RAMOS
HELEN BOYER
DAVE PRINGLE
REBECCA SHARPLESS
LISA LEHNER
ADONIA SIMPSON
ALIA AL-KHATIB
JEANNE BAKER
MARTA VICIEDO
MAGGIE FERNANDEZ
TYRONE BROWN OF TGIMMY PHOTOGRAPHY WHO PROVIDED MANY OF THE IMAGES IN THIS REPORT
ALL THE MEMBERS OF FLORIDA IMMIGRANT COALITION
AND THE MANY OTHERS COMMITTED TO THIS STRUGGLE, YOU KNOW WHO YOU ARE

MOST IMPORTANTLY, WE MUST THANK THE COMMUNITY LEADERS, YOUTH, AND ALLIES AT THE FRONTLINES OF THE FIGHT FOR JUSTICE FOR **ALL** IMMIGRANTS.